I'm David Rudolph and I represent the appellant in this matter. I want to start by just saying that the record in this case establishes that James Blackmun was actually innocent of this crime. Three judges of the Superior Court in North Carolina found that fact that he was actually innocent by clear and convincing evidence, the highest civil standard that exists. That's important because it means that we know that the incriminating admissions that he made on October 26th of 1983... I'm going to ask you to put that microphone as close as... I'm sorry. Is that better? That's much better and don't be afraid to speak up. People have not accused me of that before so I'll do my best. In any event, what it shows is that although he made those admissions on October 26th of 1983, those admissions were absolutely false. You can't have someone who is actually innocent, wasn't there, making admissions that are true. What we also know is that those admissions recited and were consistent with the physical facts in the case. That leads us to the question, how is that possible? How is someone who is not there able to make admissions to physical facts that are accurate? How does someone who knows nothing accurately describe the crime? Our complaint alleges that that happened because the defendants in this case, Mr. Holder and Mr. Mundy, studied James Blackman's mental illness, literally studied it. That's in the complaint. And they either intentionally, recklessly, or both used that information, used his psychiatric problems, his delusions, his hallucinations, his schizophrenia to feed him facts, to convince him in essence that although the good James Blackman, who was sitting in the room with them, may not have known anything about the case, the bad James Blackman, who they asked him to imagine over at the dorm room, he knew these facts. The good James Blackman, he didn't have a dashiki. He didn't have a dashiki. Yes, sir. Let's posit that all of that is true and that all of that is troubling. That sounds to me like a self-incrimination clause claim, not a due process claim. I mean, I was tricked into confessing either because they fed me false information or because they took advantage of my mental illness or any, or because they threatened me implicitly or explicitly. I mean, that may well be a good constitutional claim, but it strikes me as a self-incrimination claim, not a due process claim. Graham versus Conner and other cases say that when there's a constitutional provision that it sort of gets at this thing, we use that provision, not due process. I understand, and I want to get to it in a minute. I know you have other claims other than they fed me false information and made me confess, and I want to talk about those, but why isn't the they made me confess to something I didn't do Well, I don't think our claim is really that they made me confess. They enabled it. They fed him the facts that caused him to adopt. Well, they made me confess, but my confession wasn't voluntary because it wasn't the choice of an independent and free will. That sounds like a self-incrimination claim to me.  Well, actually, there are some places in the complaint where we do allege coercion, but the title of it seemed to be hard to do because the North Carolina Court of Appeals heard that claim and said it was not accurate. When we read the opinion, first of all, that was a factual opinion. In other words, there was conflicting evidence before the trial judge as to whether Mr. Blattman was competent or not competent. The trial judge in that matter found that the evidence that he was competent was more persuasive. The Court of Appeals was bound by that finding. So, and indeed they even said... Didn't they find that there was no coercion? Was that specifically found in their opinion? I think what they found was that it was not involuntary. I think that's the term they used. In terms of that particular opinion, it doesn't really matter at this stage because... My only purpose in asking you that was that there can be a line sometime between coercion and some sort of manipulated trickery sort of thing. But it just seems like to me if you're going to go down on the side of the line that says coercion, you have a very, very difficult claim to make. Well, and I'm not sure I agree with your honor because in the Washington case, this court made absolutely clear that the fact that someone has been exonerated, that the case has been settled in the state court means that Rooker Feldman just doesn't apply. But the law draws a distinction between manipulative tactics and coercive tactics. You have a good guy, bad guy, cop or whatever, and you have people pretending to be empathetic with the suspect when in fact they're not. And those sorts of manipulative, for want of a better word, manipulative behavior is thought to be legally distinct from something that is what we're saying is that what happened in this case where you take someone who is schizophrenic, who has delusions, who has hallucinations, and you feed those and you take advantage of those consciously and intentionally because they studied them. And now they're taking advantage of those and they're saying, well, imagine you're over here and imagine you're on the dorm floor and imagine this girl is screaming. What do you do next? And he's got all these delusions and hallucinations. Our position is that that shocks the conscience. And so to address Your Honor's question, this goes far beyond, I think, a self-incrimination issue. It goes far beyond a Miranda issue. Well, I guess, Mr. Reuther, I have one last question on this and then I want to turn to the other thing. But like, can you provide for me a case where a court has said that the subject, the suspect himself said the following words. He said the following words because of something the police did. So we're talking about a statement by the suspect. Yes, sir. That the statement was allegedly produced by what the police did and we treated that as a due process claim, not a self-incrimination claim. Well, I'm not sure this court has dealt with that, but I can give you three other cases that have dealt with that. Palsy versus Pfeiffer, which is a Third Circuit case discussed in our brief. Weary versus Foster, which is a Fifth Circuit case discussed in our brief. And Riccuti versus New York City Transit Authority, which is discussed in our brief. That's a Second Circuit case. I was just going to say, in each of those cases, the police in essence either wrote out a statement and had the person sign it. They questioned him and wrote it out and the person just signed his name or the person made those statements themselves and the court said, no, no, no, no, no. You can't feed somebody information and then say it's his own words. So let me go to something to build up with what you just said because I think it's a different... So, but can you give us a case from 1983 or before in the North Carolina Supreme Court, this court, or the U.S. Supreme Court that encompasses in the qualified immunity context your claim as you answered Judge Hyden's question? Yes, sir. Well, I mean, the cases that this court has followed in terms of when a right is clearly established is that we're talking about the contours of the right. It doesn't have to be a case on point or even a case with similar facts. We're talking about would a reasonable police officer be on notice that what he or she was doing was violative of the person's rights? And I think in this case in particular, when police officers study somebody's mental illness, know that he's schizophrenic and delusional and hallucinogenic and they then prey on that and... Is there a case with that scenario in 1983 or before in any of the relevant jurisdictions? Not that I'm aware of as I sit here right now. So then, okay, can I ask you something that builds off the first one you said? Yes, sir. It strikes me that there's a very big difference between two things. One is the police tricked someone into saying something, but he definitely said it. And my inclination continues to be that's a self-incrimination clause. The other possibility is that he did not in fact say something and the police falsely claim that he did. The defendant never actually uttered these words, but the police are attributing to him words he did not say. That to me doesn't sound like a self-incrimination claim, and that starts to sound like manufacturing evidence to me. Am I right that you allege they did that at least once here, that they attributed to Mr. Blackman statements he did not in fact say? Specifically, I'm thinking of pages 50, JA 51 and 54, where you say that they represented that he said X, but when you look at the transcript, he did not actually say X? Exactly. That's exactly right. And indeed, we don't know what he said when they were at the college because they took no notes. They didn't tape record it. So they brought him to the room where this all happened. When he couldn't describe it, they take him to the room. They take him to the scene of the attack. At that point... Well, what's wrong with taking him to the scene of the attack and having him identify the place where the attack took place? Because he's already said he doesn't know that. He can't describe it, and he's schizophrenic. Well, I know, but there are going to be a lot of defendants who are going to claim that they had some kind of mental health problem or disability and that the police took advantage of that. And where do we draw the line? To answer your question, I think we draw the line when there are psychiatric records going back years that establish that he's schizophrenic, he's delusional, he hallucinates, and the police know that. That's a big distinction in our case from some of these other cases, because as I recall in Washington v. Wilmore, part of that opinion was these officers didn't know. But it seemed to me that your real... That the prosecution had a thin case and that it should not have been brought. And you go on about the absence of the shaky nature of the ID, and you talk about the absence of a fingerprint match, and it seems to me that and you talk about the delusional quality of the defendant. But it seemed to me, reading these briefs, that you say, this is a thin case. It should not have been brought. And okay, I understand that, but if that's your problem, aren't the prosecutors the ones who are at fault here? Because they make the final call, and the police or investigators will often say to a prosecutor, here's what we've got. But the police don't make the final call on whether to let the prosecution go forward. That's the prosecution's call. You can't sue the prosecutor that easily because they have absolute immunity rather than qualified immunity. So as a result, this is shoehorned into a coerced confession case, which has the difficulties that we've been exploring, and the distinction that Judge Heitens is drawing between a confession that is obtained by trickery and manipulation and a false confession that is coerced. But the real beef was with the overall thinness of the prosecution, which is a prosecutorial matter. I don't blame you for being frustrated with the fact that prosecutors have absolute immunity, but there's nothing we can do about that. So it seemed to me that you were rerouting and trying to make it fit into a coerced confession claim when your real beef was with the exercise of prosecutorial discretion. The problem is the prosecutors didn't know everything. There's no evidence in the record. There's nothing to support that the prosecutors knew anything about how this statement was obtained. How do we know that? There's nothing in the record either way about that. Suppose the police officers were candid with the prosecutor and said, here's what we've got and described the problems that you've alluded to. Here's why I think that didn't happen, because when they got an eyewitness into their office, into central prison, and she said, that's not the person. And they said, well, he's confessed. And she said, well, if he's confessed, he's crazy because he's not the person. And they suppressed that. They never wrote that report up. They never informed the prosecutor of that. So that tells us... Do we really know what conversations took place between the police and the prosecutors in this case? We know that they didn't write a report. They didn't tape report it. They violated their own regulations by not making a record of that identification or lack of identification. That seems to me to be an intentional act. And at least at this point, we're just in a motion to dismiss here. We haven't had any chance to do any discovery at all. So what we're really asking this court to do is to send it back so we can flesh out some of these issues. Flesh out what? The conversations between the police and the prosecutors? Among other things, yes, sir. That's the whole purpose of discovery. Anyway, that's what we're asking. We're asking the court to send it back so we can do our discovery. This is a very premature motion. Yeah, I understand that. But, you know, the qualified immunity or any kind of immunity is an immunity from suit. And the farther the deeper you go into the case, the more the value of the immunity is depleted. I agree with that. But you have to balance that against whether or not any facts can be developed to show that there shouldn't be any immunity. It's a balancing, it seems to me. Let me ask my co-panelists if they have questions. One more question. If you could go back to your answer to Judge Hyten's last question and point us again where exactly in the complaint you allege that the police officers fabricated a statement by Mr. Blackman that he did not make. I'll see if I can find that quickly, Your Honor. Well, just tell us when you get up on rebuttal. Thank you. Thank you very much. Thank you. Thank you. Mr. Benton. Good morning, Your Honors, and may it please the Court. Again, my name is Jason Benton. I represent one of the individual capacity defendants in this matter, James Holder, a former Raleigh police detective. Rachel Keene represents the other individual capacity defendant, Andrew Munday, but I'll be arguing on behalf of both officers here as their positions align. Your Honors, this is not a fabrication of evidence claim. Rather, it's a doomed, coerced confession claim that is subject to qualified immunity. In 1983, there was simply no controlling legal precedent putting a reasonable law enforcement officer on notice that asking a mentally infirmed suspect leading questions was unconstitutional. If it were otherwise, an appellant would have presented that case to Your Honors. The North Carolina Court of Appeals in 1989 would have presented that case, or we would have seen it in this circuit or in a district sitting in this circuit. The lack, Your Honors, of any legal precedent to support a coerced confession has led this appellant to avoid that characterization. What was the clearly established law at that time in your view? In 1983, Your Honor, what we understood to be clearly established was that police coercion included things like depriving a suspect of food, water, sleep, physical abuse, psychological abuse, making promises in exchange for a confession, all things that did not exist here. There was no clearly established law preventing or putting an officer on notice that asking leading questions... What you're saying here is the allegation is that the police were preying on someone's mental infirmity or taking advantage of someone's mental infirmity. And you're saying, that's what they're saying, and you're saying that's not enough to abrogate qualified immunity. That's correct, Your Honor. That's correct. But, you know, you get maybe a hard case makes bad law. He seemed pretty far gone, the alleged perpetrator here. I guess the strongest point you make is that if we take the whole doctrine of coercion and move it into the realm of manipulative activity and activity where interrogation takes advantage of someone's susceptibility or someone's claimed disability, that it's hard to draw the line. You've got a difficult case on the facts here, but you have a stronger point with respect to the slippery slope argument and how far we would go if we head from the classic definition of coercion into some other definition of a Fifth Amendment violation. Right, Your Honor. And even if this Court, we would contend, Your Honor, that these facts that are alleged do not constitute coercion. But even if this panel believed they did, the further point is there was no legal precedent in 1983 to let officers know that this conduct was regarded as coercive. Am I correct that you are not arguing that the North Carolina Court of Appeals rejection of the self-incrimination claim has any sort of claim preclusive, issue preclusive, or Rooker-Feldman? Your brief prominently notes that they rejected this claim, but your brief never argues that it's preclusive or it's binding or can't be collateral. Am I right about that? You are, Your Honor. It's simply a matter of trying to prove a negative. That if the appellate court sitting in 1989 didn't find it, if the appellant hasn't presented it, if the Washington line of cases didn't find it, it's just not there. And the reason why we see a fabrication label here is because the appellant contends, and we agree as appellees, that any reasonable officer in 1983, in the year 1983, and long before that, frankly, would understand that fabricating false evidence against a suspect violates the process. So what this is, Your Honors, is an attempt to costume that coerced confession claim that would fail into a fabrication claim. It's an attempt to fix a very real, clearly established problem. Okay. So given that, can I ask you about the two places that I think the complaint, at least arguably, does allege fabrication of evidence and ask you for your thoughts on those? So the first one is on JA-54. This is where, I'll just read it while you find it. It says, Blackmun requested earlier that he wanted to show the investigators that he went to Latham Hall and also shows them what he did and where it happened. I mean, maybe that can be read different ways, but we are on 12b-6 and we have to construe the complaint in the light most favorable to the plaintiff. Why is that allegation not potentially read as saying the officers attributed to him words he did not say? Well, Your Honor, if possible, I guess it could be construed that way. And if so, well, that's fabricating evidence, right? Attributing words to a suspect that the suspect never uttered is fabricating evidence, isn't it? It can be, Your Honor. Let me answer it this way. Number one, there's likely a causation problem for them on that allegation. Totally agree. There might be a causation problem. Right? And number two, Your Honor, by appellant's own brief and their own legal authority, the litmus test for determining whether there is a fabrication of evidence is whether the defendants know that the evidence is false. And here, where you're talking about a suspect actually answering questions, albeit to leading questions, and you have an allegation. But if you attribute, if I had a conversation with you, and then after that conversation, I told a third party that you had said something that you did not in fact tell me, I would know that you did not in fact say that, right? Or at least it's plausible I would know that you didn't say that. That's fair, Your Honor. That's fair. And I can't quibble with that point. I guess I'd go back to, Your Honor, the very real present question of is there a causation? No, sure. Sure. And so, look, I appreciate that. Let me ask you about the other one. Because I agree. Most of the complaint to me sounds like a coerced confession claim. So the other one is on JA62-63. This is the part where during the lineup, the witness is told that Mr. Blackman has confessed to the murder after she failed to pick him out of the lineup. Had he in fact confessed at that point? According to the complaint, he had, Your Honor. The detail concerning the confession is on October 25, 1983 and October 26, 1983. Some of which were interviews. Some of which were, I guess, what we could call field trips to the location. How is it tampering with a witness to tell the witness? So the whole premise is I bring you in and I say, is this the guy? And the person says, no, I don't think it is. And then I said, would you like to reconsider your answer in light of the information I'm about to give you? Isn't that pretty classic witness tampering? Well, Your Honor, that could be regarded as we sit here today, inappropriate policing, but it doesn't necessarily rise to the level of federal constitutional... You think a reasonable police officer in 1983 could have thought it's okay to tell a witness who just said that's not the guy, would you like to think again because that guy told you he said he did it? Doesn't that defeat the entire purpose of a lineup? Your Honor, I understand Your Honor's point there. I will say this, that as we deal with the facts of this case, that would have come after the confession. The train has left the station at this point. You have officers here that have interviewed Mr. Blackman. He has confessed before that physical line. No, but that's not true because the defendant confesses and then at trial the defendant tries to argue his confession wasn't true, it was false. I realize this was an Alford plea, but imagine this case goes to trial, right, which could impact whether someone takes an Alford plea. So the defendant has made incriminating statements and at trial his strategy is going to be those were false. They were, even if they weren't coerced under the Fifth Amendment, I was tricked, I was manipulated, I said things that weren't true. It's really helpful if the prosecutor can say, well, we know he's lying now because a witness totally said it was him. So I don't think you can say the train has necessarily left the station because the prosecutors can then say good luck trying to walk that confession back now that a witness has said it to you. But in terms of measuring the conduct of the officers in 1983, if they're faced with evidence, and this is in the record, in the complaint, of inculpatory and exculpatory evidence before there's a confession, and then there's a confession, inculpatory statements on top of that, that's what I mean when the train has already left the station. And if we're measuring the conduct of these officers in hindsight, that's where I think we would have a problem. When you look at the gravamen of the complaint, take the complaint as a whole and take the argument as a whole. I don't think, I think the argument here is that the suspect's weakness, it is not that they put words in the suspect's mouth. Now, I suppose it is a spectrum and at a certain point, preying upon the weakness could be putting words in the suspect's mouth. But basically, it seems to me the gist of it is that they preyed upon a known weakness. And not that they put words in their mouth or falsified something or did this or that. And the question then becomes, was there a law that put the officers on notice that interrogation, which preyed upon a suspect's known weaknesses, somehow a constitutional violation. But I do think that the claim has not struck me of something which is fabricated or falsified or deliberately falsified. The claim is you knew this person had a weakness and a may be wrong today. And it may be wrong as a general moral matter. It may be wrong. But the question is not as a matter of moral abstraction, but what the law was at the time that the officers were undertaking the investigation. And whatever we might think of this as a moral matter, as a legal matter, the question is whether the police officers were put on notice that this was in violation of the law. And I understand, maybe I'm missing something, but that's what I understood to be the gravamen of your argument. That's right, Your Honor. In fact, there is no case law that we've been able to uncover, nor I would submit, Your Honor, that the appellant has that would have put the officers on notice of just that point. In fact, although it's a district court decision in Washington, too, that court looked at 1983 conduct, the conduct in 1983 of officers interrogating Mr. Washington, the suspect in that case. Mr. Washington was mentally infirmed by his own allegation. And that court said there was nothing to put these officers on notice, that asking him leading questions was constitutionally improper. In fact, it went further to say even if they knew he was mentally infirmed, there was nothing to put them on notice in 1983 that that act of asking that suspect questions was unconstitutional. I'm just, the whole question, do you have a question? No, go ahead. The whole question of whether they knew someone was innocent or suspected someone was innocent, does that play into that? Does it play into this at all? It does in this case for this reason, Your Honor. Here we have admittedly no acts of coercion, at least no acts of coercion that were recognized as such in 1983. And we have an admission from the appellant that these officers believed that Mr. Blackmun committed the murder. Didn't the district court give way too much weight to that fact? You can absolutely frame someone you think is guilty, right? Yes. Right, and it is absolutely unconstitutional to frame someone even if you really believe they did it. Agreed. Okay, so why does that matter? I just noticed that the district court attached an enormous amount of significance to that. And I guess with respect, my reaction is I don't know why that matters because I can absolutely imagine scenarios where police officers honestly believe you could hook them up to a lie detector test. They believe this person did it and they believe he's going to walk because they believe they can't get evidence to prove that he did it and they make up evidence. I'm not saying that's what happened here, but I could totally imagine that situation and that is absolutely unconstitutional no matter whether you believe he's guilty or not, right? Well, Your Honor, and appellees don't dispute that. We don't argue that. We agree with Your Honor's assessment. I think... But what they subjectively, to follow on Judge Hyden's question, what they subjectively believe, how is that important in a qualified immunity analysis? Because a qualified immunity analysis doesn't turn on a subjective belief. It turns on objective reasonableness. And objective reasonableness is what the law lays down. Would a reasonable officer in 1983 who believed that Mr. Blackmun had committed the murder and did not perform any coercive acts, would those officers believe they'd committed a violation of the Constitution? I think that's how it fits in. And the answer to that is no. But I think what Judge Wilkinson was just saying, I think under Harlow, the first sentence of that should be stricken because under Harlow, I don't care what they believe. Because, I mean, this is what's good for the goose is good for the gander, right? So we say that a plaintiff can't get past qualified immunity by saying that in their hearts they meant bad things, right? Harlow, you cannot get past qualified immunity by saying, I know a reasonable officer wouldn't know it, but this officer had malice and hate in his heart. And Harlow says that is irrelevant. You can't get past qualified immunity. But the flip side that is also true, which is that by saying, I swear to God that I meant no harm, isn't also a defense in a qualified immunity situation. Understood, Your Honor. And I would just say this. If you accept the appellant's own contention that the defendant knew that the evidence itself was false in order for there to be fabrication, then the real problem becomes when you're talking about the fabrication being what the suspect actually said in response to the question. No, I'm totally with you on that. I'm asking you, but again, you've heard me, what I've said about paragraph, page 54. Page 54 strikes me as different. If they said he said something he didn't say, why could a reasonable officer in 1983 have believed that was constitutional? And I understand Your Honor's point there. And again. Can I have a follow up on that then? Because we don't, like this is a multi-count complaint, right? So count two to me, to me, count two just looks like a coerced confession claim. That just looks like a straight up coerced confession claim. But count one is broader than that. And so I guess my biggest concern about the district court's opinion is that it starts with the premise that at heart this seems like a coerced confession claim. That fails. But what I don't see the district court is going through count by count of the complaint and asking, okay, assuming that you can't bring a coerced confession claim, that probably requires dismissal of count two. It maybe requires dismissal of a bunch of the allegations in count one. But we do complaints count by count, right? We don't say what the plaintiff is really saying. No, Your Honor. But I think that all of the federal constitutional claims all culminate in this allegation that these officers somehow fabricated That's not true. There's a malicious prosecution claim. There's a manufacturing evidence claim. But the malicious prosecution claim by the allegations listed all derive from the allegation that these officers fabricated, coerced, whatever label you want to put on it, the relies on and derives from. And Your Honors, I would say this. There are only really two Fourth Circuit decisions that the appellant relies on to try to contend that this is, in fact, a fabrication of evidence claim. And neither one of them fit the facts here. The first one is Washington v. Willmore, which came before this court. It was the appeal of Washington II. And the problem, though, for the appellant is in that case, the court was only considering and addressing Officer Willmore's claim. That is, the claim against Officer Willmore that he fabricated evidence by mischaracterizing the confession in a police report. Not what we have here. The other Fourth Circuit decision is Gilliam v. Seeley. But that case, Your Honor, involved signed written confessions in the context in which the suspects did not understand they were signing confessions. It also involved clear acts of police coercion. In other words, in that case, officers were yelling in the suspect's face. Officers were making threats, including the threat of death by gas chamber if the suspects did not confess. It also involved racial epithets, something that just doesn't exist here. There are also out-of-circuit cases they rely on, Your Honor, some of which, many of which, regard police conduct that occurred after 1983. One case they double down on is the Gonzales case, which is a district court case from Illinois. But again, not only did that case involve 1994, not 1983 conduct, but there was typed out confession by Gonzales there, and he signed it without being able to read it or understand it, and there was clear officer coercion. The officers told the suspect that a judge would let him go in spite of any confession if they confessed. He was deprived of food, water, and sleep in the interrogation. Your Honors, I see that my time is up. May I briefly conclude? Yeah, Lee. I was going to say that the police belief in someone's innocence or not, it does factor in at the very beginning of a prosecution, or in the very beginning of a case, the very beginning of an investigation. If the police believe someone is innocent, they're going to drop the investigation. It's not going to go any further. The question is, when something has progressed this far, you know, we're not at the situation where the police are saying, after talking to someone, saying, well, we're convinced he's not a suspect. They may drop the whole thing. And so police view of innocence, it seems to me, is relevant at a certain stage. At a certain point in the investigation, when it's gone as far as it has, it seems to me that the subjective belief in innocence is not a police call. It's less and less of a police call the further the case goes along. And at a certain point, it doesn't seem to me legally relevant what they believe, that that's a prosecutor's call, and maybe eventually the jury's call if the prosecutor, as here, went forward. But what the police believe seems to be more important at the very beginning of the process and the very beginning of the investigation than it is with something that's gone, that went as far as this one and dealt with how you assess and size up numerous items of evidence. See what I'm saying? I do, Your Honor, and understood. And, Your Honors, ultimately, what we'd ask is that you affirm the district court's grant of dismissal as to the federal constitutional claim and affirm the denial of the motion to modify and or amend of the appellant. Thank you, Your Honor. Counsel, you have some time for rebuttal. I just want to address quickly Your Honor's point about whether words were put into Mr. Blackman's mouth. The answer is yes, they were. I'm sorry. You asked whether words were put into Mr. Blackman's mouth. And the answer is yes, they were. They were put into the mouth of the bad James Blackman. So, for example, when the good James Blackman says, I never owned a dashiki, I never owned a knife, they then go to the bad James Blackman and say, what about that bad James Blackman? Was he wearing a dashiki when he said that? Yeah, yeah, that's right. And the knife, you know, did he have that knife? Did you see this knife? Oh, yeah. So, they are putting words in the bad James Blackman's mouth. That's the hallucinogenic James Blackman. So, it is very much a fabrication case in that sense. They fed him the facts. And that's why I think it takes it out of the coercion issue. They fed him the facts. When you feed somebody the facts and they adopt those facts, that is fabrication. That's the essence of fabrication. Your Honor, to answer your question, I think Judge Hayden Titans has answered your question about where in the complaint it alleges. Tell us what that paragraph specifically does that relate to. Page 54. Thank you. My eyesight used to be better. So, what it relates to is that he, it relates to the fabrication and what they're claiming he said. Because if he said, oh, I want to go over to Latham Hall. If I go over there, I can explain it to you. He actually said that. Then that would be some reason, as your Honor pointed out, to take him there. But what he said was, I don't know anything about Latham Hall. I've never been to St. Augustine. What part did Miranda warnings play in all of this? They never gave him any Miranda warnings because he wasn't in custody. He came and went freely. They bought him scopes. They took him to McDonald's. They drove him around the city. Did they give him any Miranda warnings at any point? No, sir. Could you bring a claim on the absence of Miranda warnings? I don't think so, because it was pretty clear that he was free to go. He was never under arrest or restrained. Does that weaken your coercion claim? I'm sorry, what's that? If he's free to go at any time, does that weaken the coercion claim that you don't have a claim that the interrogation was even custodial? No, because it's not about the physical way in it's about the mental way. It's the psychological way. You asked earlier about a case that established in 1983 that psychological coercion was violative of the due process clause. Yes, Gilliam v. Seeley, which this court decided in 2019, found that a person coerced by psychological means stated a due process claim. What year was that? I'm sorry? What year was that? That was 2019. We were looking for 1983. No, no, no. They said it existed in 1983. That case arose in 1983 or before 1983. The court in Gilliam said, and that claim existed in 1983. Let's go back to that paragraph 191. Yes, sir. As alleged in the complaint, it says the transcript of the interrogation doesn't contain any statement by Blackmun that he wanted to show investigators. But there isn't a follow-up sentence that I would have expected to see that says information and belief. He didn't say that. So I'm not sure how that helps you because it seems like to me you have a threshold Twombly problem here. All you've alleged is there's a transcript that, as a matter of fact, doesn't have a particular statement in it. You haven't alleged that there's a fabrication of anything, have you? I'm moving my times up. May I answer your question? Yes, you may. Thank you. It's not a Twombly question because at this stage we're entitled to the reasonable inferences drawn in our favor. So why is it reasonable that that statement of fact, that this particular sentence doesn't appear in the transcript, why is it reasonable to deduce from that that there's something fabricated elsewhere? Because they transcribed the entire interview. The whole interview was transcribed. There was nothing that was not transcribed other than this trip to Latham Hall. Doesn't paragraph 191 not just say they're not in the note, the transcript, but doesn't the second sentence say they are inconsistent with the statements? Yes, exactly. I'm out of time. Thank you all very much.
judges: J. Harvie Wilkinson III, G. Steven Agee, Toby J. Heytens